**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  1:19-cr-486** |
| | : | |
| **DEMONTE KELLUM** | : | |
| | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM**

### I.      Introduction

Mr. Kellum pled guilty to conspiracy to commit racketeering with an

11(c)(1)(C) range of 180 months to 240 months.  For the reasons set forth

below, a sentence at the low end of this range is sufficient but not greater

than necessary to achieve the purposes of sentencing.

### II.      Law of Sentencing

The law requires this Court to impose a sentence sufficient but no

greater than necessary to achieve the goals of sentencing in 18 U.S.C. §

3553.  The § 3553 factors include 1) nature and circumstances of the offense,

2) history and characteristics of the defendant, 3) need for the sentence to

reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense, 4) need for the sentence to afford

adequate deterrence to criminal conduct, 5) need to protect the public from

further crimes of the defendant, 6) need to provide the defendant with

education and vocational training, medical care, or other correctional

treatment in the most effective manner, 7) the kinds of sentences available,

8) provide restitution to victims, 9) avoid unwarranted sentencing disparity

among defendants involved in similar conduct who have similar records.

The sentencing guidelines must be considered but are not binding on

the Court.  *United States v. Booker*, 542 U.S. 220 (2005).

III.   **Sentencing Guidelines**

   a. **Guidelines Calculation**

      i. **Pre-Acceptance Offense Level Should be 43 not 45**

Mr. Kellum and the government both agree that a below guidelines

sentence is appropriate in this case.  However, as the Court has a

responsibility to calculate the guidelines in every case, Mr. Kellum must address his objection to the presentence report calculation.

In Mr. Kellum's plea, the parties agreed that "[p]ursuant to Application Note 2 of U.S.S.G. Chapter 5 Part A, an offense level of more than 43 is to be treated as an offense level 43.  Therefore, the final adjusted offense level is **43**."  ECF 272 at 5.  With acceptance of responsibility, the parties agreed, his final adjusted offense level would be 40.  *Id*.

The presentence report, by contrast, applies the Ch. 5 Pt. A n.2 reduction after the acceptance of responsibility adjustment, rather than before.  Because Mr. Kellum's offense level after acceptance is 42, the probation officer contends, Ch. 5 Pt. A n.2 does not call for a reduction. PSR Addendum at 1.

The text of Ch. 5 Pt. A n.2 is as follows:

In rare cases, a total offense level of less than 1 or more than 43 may result from application of the guidelines…An offense level of more than 43 is to be treated as an offense level of 43

The Fourth Circuit does not seem to have had occasion to construe this note in a published opinion.  However, the text itself

supports Mr. Kellum's interpretation.  Notably, the guidelines use the

term "total offense level" rather than "adjusted offense level" or

"total adjusted offense level."  This suggests that the note was

intended to apply prior to the application of the acceptance guideline.

To the extent this note is open to varying interpretations, it should be

construed in favor of the accused.  *See*, *United States v. Cutler*, 36 F.3d

406, 408 (4th Cir. 1994)(Rule of Lenity applicable to sentencing

guidelines).

The government has previously taken a position in these cases (all of

which have basically the same guidelines) that the Total Offense Level is 40

rather than 42.  *Banks*, ECF 79 at 2, n.1.

IV.    **Sentencing Factors**

    **a.  History and Personal Characteristics**

Mr. Kellum was born out of wedlock in 1997.  PSR ¶ 68.  His mother

was only 15.[1]  However, Mr. Kellum's mother soon made great strides to

better herself and provide for him.  She got her GED and completed Medix

---

[1] *See*, https://www.marchfh.com/obituaries/Shonte'-Ellis-1248810641/#!/Obituary

School in 2001.[2]  She worked at Genesis and SAM's Club.[3]  And, although Mr. Kellum's father was not in the home, he was "actively involved in his childhood."  PSR ¶ 69.  Although Mr. Kellum's young family faced enormous challenges, they initially seemed well positioned to give him a healthy and stable upbringing.

All of this suddenly changed when Mr. Kellum's mother was murdered in 2009.  PSR ¶ 69.  Mr. Kellum was 12 years old.  *Id*.  According to remaining news reports accessible on the internet, Ms. Ellis was in a vehicle outside the Clubhouse Bar when a gunman opened the door and shot her 16 times.  Following Ms. Ellis' death, Mr. Kellum's father did not take custody of him, as one might have expected.  In fact, Mr. Kellum's "contact with his father decreased subsequent to his mother's death."  PSR ¶ 69.  Mr. Kellum went to live with his maternal grandmother.

At age 13, about a year after his mother's murder, Mr. Kellum became addicted to marijuana and used it every day.  PSR ¶ 80; *See also*,

---

[2] *Id.*
[3] *Id.*

PSR 81 ("He was diagnosed with cannabis use disorder").  Although many adults use marijuana with seemingly few negative effects, marijuana addiction is disastrous for young teenagers.  According to the Center for Disease Control, negative effects of teen marijuana use include difficulty thinking and problem-solving, problems with memory and learning, reduced coordination, difficulty maintaining attention, and problems with school and social life.[4]  The National Institute of Health states that, "teens who engage in heavy marijuana use often show disadvantages in neurocognitive performance, macrostructural and microstructural brain development, and alterations in brain functioning."[5]

Whether from marijuana use, other factors, or both, Mr. Kellum did not perform well in school.  His situation was likely not helped by the poor quality schooling available his area.  According to online rankings, Mr. Kellum's high school is rated D+ for academics and D+ overall.[6]  He

---

[4] *See*, https://www.cdc.gov/marijuana/health-effects/teens.html#:~:text=Difficulty%20thinking%20and%20problem%2Dsolving,Difficulty%20maintaining%20attention

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3930618/

[6] https://www.niche.com/k12/the-reach-partnership-school-baltimore-md/

dropped out of school in 2016 without receiving his high school diploma. PSR ¶ 83.

Mr. Kellum enrolled in the Woodland Job Corps Center in Laurel, Maryland in 2017.  Woodland Job Corps provides practical[7] career training to students who live on the campus.  Mr. Kellum chose to study carpentry. This was a good opportunity for Mr. Kellum, with the potential to give him the ability to earn a living and the self respect that comes with that. However, before he could complete the program he was expelled for a fight with another student that resulted in his sole criminal conviction for misdemeanor simple assault.  PSR ¶ 83.  Mr. Kellum got in the fight in response the other student committing theft.  PSR ¶ 60.  The occasional fistfight would not seem unexpected for a large group of young men living in close proximity and it is greatly to be regretted that Mr. Kellum's plans to earn his living as a carpenter were thwarted for this reason.

Undeterred by his expulsion from Woodland, Mr. Kellum continued his efforts to find honest work.  Through a temp agency he got a job at Fila

---

[7] *See generally*, https://woodland.jobcorps.gov/train

Distribution Shipping in 2018.  PSR ¶ 85.  This job was about 14 miles and 30 minutes with no traffic away from Mr. Kellum's home in Northeast Baltimore.  Mr. Kellum could not afford his own vehicle at the time.  The time an expense of making this commute proved unsustainable and Mr. Kellum had to leave this employment.

By the summer of 2019 Mr. Kellum was 22 years old and had managed to avoid many of the traps for young Baltimore men that his tragic childhood made him statistically susceptible to.  He had not become involved in the drug trade, had not joined a gang and had not been through the juvenile criminal justice system.  However, a combination of negative peer influences and judgment impaired by drug use would ultimately lead Mr. Kellum to make several tragic and out of character decisions, as described in the next section.

### b.  Facts and Circumstances of the Offense

As the statement of facts makes clear, the RICO enterprise at issue here was a particularly broad and diffuse.  *See*, ECF 1:20-cr-207, ECF 79 at 2 (government sentencing memo) ("The members do not identify themselves

as a traditional gang; the defendants do not have a name, motto, written

rules, or national recognition.").  The enterprise:

> [C]omitted a series of armed commercial robberies, armed
> robberies, attempted armed robberies, and carjackings, some of
> which resulted in the murder or non-fatal shooting of the
> victims.

ECF 272 at 10.

Mr. Kellum was not acquainted with many of the participants and

had no knowledge of most of the RICO acts.  The Statement of Facts lists 20

RICO acts 17 of which Mr. Kellum is not alleged to have had any

connection to.  The three RICO acts connected to Mr. Kellum took place in

a roughly one week period in July and August of 2019.

To be sure, the Mr. Kellum's three acts are not minor offenses.  They

involved three robberies and the death of two innocent people.  However,

even with respect to these offenses, Mr. Kellum is not named in the

Statement of Facts as the instigator, triggerman, or otherwise having

played any aggravating role as compared to the other participants.

Finally, unlike several codefendants, Mr. Kellum was a participant in

only one of the two conspiracies charged in this case.  Although Mr.

Kellum pled guilty to a single conspiracy, the government originally theorized the case as involving two conspiracies – one for carjacking and one for commercial robbery.  For example, codefendant Jamai Wells' plea bargain describes him as having participated in a carjacking conspiracy with codefendants Foster, Nesmith, Williams, Evans and Kellum and a separate commercial robbery conspiracy with codefendants Williams, Banks, and juvenile.  1:20-cr-207, ECF 40 at 12-15.  Those defendants who participated simultaneously in two criminal conspiracies should naturally face more severe punishment to deter them and protect the public than those like Mr. Kellum who just participated in one.  Participation in one conspiracy could come about through unfortunate circumstances such as peer pressure but participation in two conspiracies tends to show a true criminal propensity.

   **c. Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

   Under RICO law, any defendant can be punished for that acts of any other defendant so long as the acts were reasonably foreseeable as part of

the conspiracy. *See*, Sand, Modern Federal Jury Instructions 19-9 ("the reasonably foreseeable acts of any member of the conspiracy and in furtherance of the common purpose of the conspiracy, are deemed under law, to be the acts of all the members, and all of the members are responsible for such acts").

The RICO sentencing guideline § 2E1.2 also follows this theory of liability. It instructs the court to apply the base offense level applicable to the underlying racketeering activity. The guidelines do not distinguish between "underlying racketeering activity" committed by the defendant himself versus acts committed by codefendants.

That the guidelines do not observe this distinction does not mean it is irrelevant to culpability. Consider a hypothetical defendant who joined the enterprise with the sincere hope that the "reasonably foreseeable acts" would never happen and/or considered the chances of them happening to be low. He may also have joined the enterprise intending to use whatever influence he had to prevent "reasonably foreseeable acts" from ever occurring. Perhaps he even believed that the odds of his coconspirators

committing "reasonably foreseeable acts" such as murder would be lower with himself as a member of the enterprise than they would be otherwise. All of these things may be true, and the defendant will nonetheless be subject to the same conviction and guidelines as if he ardently desired murder and personally committed it out of evil motives.

Luckily, § 3553 allows the Court to avoid this overly harsh application of the guidelines in the name of "just punishment."  As explained elsewhere in this memorandum, Mr. Kellum's life history does not give the impression that he is inherently violent or indifferent to his fellow men.  On the contrary, one naturally concludes from the available information that if Mr. Kellum's childhood life circumstances had been even slightly improved he would not be in the position he is in today.  This Court should therefore vary downward from the guidelines' mechanical assignment of level 43 to any defendant convicted of a RICO conspiracy involving murders to account for the particular circumstances of this defendant.

### d. Adequate Deterrence to Criminal Conduct (General and Specific)

#### i. Specific Deterrence

A sentence greater than 180 months is not necessary to achieve adequate deterrence for Mr. Kellum.  In the best-case scenario, Mr. Kellum will be fast upon middle age by the time he is released.  Statistically, Mr. Kellum's likelihood to reoffend will decrease with each passing year while he awaits his release date.  According to a Sentencing Commission analysis:

> Age exerted a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the of the length of sentence.[8]

The fact that Mr. Kellum only has one misdemeanor conviction decreases Mr. Kellum's chances of reoffending still further.  Another quote from the same Sentencing Commission analysis:

> Age and criminal history exerted a strong influence on recidivism.  For offenders in Criminal History Category I, the rearrest rate ranged form 53.0 percent for offenders younger

---

[8] https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

than age 30 at the time of release to 11.3 percent for offenders age 60 or older.  For offenders in Criminal History Category VI, the rearrest rate ranged from 89.7 percent for offenders younger than age 30 at the time of release to 37.7 percent for offenders age 60 or older.[9]

It is likely that the statistics of human behavior will operate especially favorably in Mr. Kellum's case because his personal history does not show any deep-seated propensity for violence or crime.  Apart from the one-week period in 2019 that gave rise to this case, Mr. Kellum has no record of violence with exception of a simple assault in 2017 that appears to have been at least partially justified (in response to theft).  The PSR describes him accurately as a "loner."  PSR ¶ 70.

Finally, the deterrent effect on Mr. Kellum has been magnified by the conditions of his pretrial confinement.  He has been in federal custody since January 19, 2021.  ECF 133 (return of arrest warrant).  As the Court is aware, CDF was designed as a maximum-security prison not a pretrial detention facility.  Even in normal times there is little opportunity for recreation, education or employment.  During COVID conditions, there

---

[9] *Id*.

were even fewer opportunities for constructive activities.  Early this year,

Mr. Kellum was abruptly moved to a prison in Ohio, which limited his

contact with family and counsel.

### ii.  General Deterrence

A sentence of more than 180 months (low end of C-plea) is also not

necessary to achieve general deterrence.  Common sense would dictate that

would be racketeers would not be materially more deterred by the prospect

of serving 240 months (high end of C-plea) as compared to 180.

Furthermore, many of the persons most in need of deterrence are

going to be members of the criminal class with significant criminal

histories.  Should they learn of Mr. Kellum's case, one of the most salient

facts is going to be that he had only one misdemeanor conviction.  Even a

layman will rationally conclude that those with significant criminal records

will receive harsher sentences than Mr. Kellum (and be correspondingly

deterred).

### e. Unwarranted Disparities

18 U.S.C. § 3553 counsels the sentencing court to take account of the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Malik Evans and David Banks are two codefendants to compare to Mr. Kellum.

Mr. Banks was charged in the related case of 1:20cr207. He was involved in the Tavon Lowther and Steven Tasker homicides. Mr. Banks personally shot and killed Mr. Lowther during a carjacking on June 12, 2019. He narrowly missed another homicide on July 24, 2019 when:

> Banks and three co-defendants decided to rob a marijuana dealer. They found the dealer in front of the One Stop store. They chased the dealer into the store and Banks opened fire. Banks did not hit the dealer or miraculously anyone else inside the store, including a toddler. However, the dealer accidentally shot K.K., an uninvolved customer, during the attack. K.K. suffered extreme physical and mental injury because of this event.

*Id*. at 3.

Mr. Banks also committed four armed robberies in the summer of 2019 during which he personally possessed a gun. ECF 79 at 3. He was criminal history category III including prior armed robberies. *Id*. at 2. This

16

Court gave Mr. Banks 300 months pursuant to an 11(c)(1)(C) plea. Mr. Banks is much more culpable than Mr. Kellum because he personally committed a murder, almost committed another in the presence of a child, and committed other armed robberies during which there could have been more loss of life if things had gone wrong. He also had previously been arrested for robbery and continued to commit the same crime. It is clear that Mr. Kellum should receive a much shorter sentence than Mr. Banks.

Malik Evans participated in four carjackings during July of 2019. ECF 210 at 1 (government sentencing memo). He received 204 months in an 11(c)(1)(C) plea bargain. Although nobody was shot or killed during Mr. Evans' criminal acts, this hardly can be said to reflect positively on Mr. Evans' character or criminal propensity. As the government put it in its sentence memo for Mr. Evans, it was purely a matter of "[l]uck[]" that nobody died during Mr. Evans' crimes. ECF 210 at 1. Although the difference in culpability is not so great as with Mr. Banks, it is appropriate to give Mr. Kellum a lesser sentence than Mr. Evans because Mr. Evans participated in more overall dangerous criminal acts.

## V.      Provide the Defendant with Vocational Training

As discussed above, Mr. Kellum has already received some training in carpentry.  He would like to pursue a career in the trades upon release. If this Court gives Mr. Kellum 180 months, then, according to rough calculations, he can expect release sometime in 2033 when he will be about 36.  At this age, he will still be well positioned to begin an apprenticeship, even in a physically demanding trade.  His children will still be school-age and Mr. Kellum will be able to support them before they are grown.  In sentencing Mr. Kellum to 180 months therefore, this Court will impose an extremely significant punishment for Mr. Kellum's offense while at the same time leaving a chance for redemption once Mr. Kellum's debt to society is paid.

## VI.    Conclusion

For the foregoing reasons, Mr. Kellum requests the Court impose a 180-month sentence.

Respectfully submitted,
By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM &
GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 265-2173 (fax)
charles@burnhamgorokhov.com

'

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this filing, which was electronically filed in

this case, was forwarded via ECF to the Assistant United States Attorney of record.

By: <u>*/s/ Charles Burnham*</u>
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1750 K Street NW, Suite 300
Washington, DC 20006
(202) 386-6920 (phone)
(202) 265-2173 (fax)
Charles@burnhamgorokhov.com
